UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 04-10093-MLW |
| | ) | |
| | ) | |
| DAVID GLAVIN | ) | |

<u>MEMORANDUM IN AID OF SENTENCING</u>

The defendant David Glavin, through undersigned counsel, respectfully submits this memorandum to assist the Court at sentencing in the above-captioned case. The sentencing is set for February 4, 2005. Counsel requests the Court to impose a sentence of sixty months. Counsel submits that a sixty month sentence is a stern punishment which satisfies the requirements of 18 U.S.C. §3553(a): the sentence reflects the seriousness of the offense, adequately deters further criminal conduct, protects the public from further harm, and allows the defendant to receive treatment he needs in an effective manner.

<u>The Offense</u>

On December 2, 2003, David Glavin robbed the Sovereign Bank at 125 Summer Street in Boston of $620. He handed a bank teller a note which read, "I have a gun. Give me all the 100s, 50s, and 20s. No dye-packets and no-1 gets hurt. Please do as I say !!!" Glavin had a knife in his back pants pocket, though he did not

remember this at the time, and he did not use the knife during the robbery; he did not have a gun. Glavin fled the bank and headed to South Station. He was arrested inside the station by a Boston Police Department officer who had heard a broadcast concerning the robbery over the police radio.

### The Defendant's Personal Background[1]

David Glavin was born on June 22, 1976. His parents, Jeanne Glavin and Louis DiSciullo, were never married. Jeanne Glavin was 14 years old when David was born; Louis DiSciullo was 16 or 17 years old. From David's birth, he was cared for primarily by his maternal grandparents in Dorchester, as his mother was far too young to take responsibility for a baby. Louis DiSciullo had almost no involvement or contact with David from his birth, as Jeanne's family disapproved of him and discouraged any contact.

Jeanne Glavin had drug problems from the time she was a teenager. She fell out with her parents after David was born and was essentially evicted from her family's home. During David's infancy and early childhood, Jeanne lived with friends or on the streets while David was with her parents. When David was 4 or 5 years old, Jeanne retrieved him from her parents. By this time she had taken up with Robert Bennett, whom David refers to as his

---

[1] The information below was provided by Mr. Glavin and Cathy St. Germain, a lifelong friend of Jeanne Glavin's who was intimately acquainted with the family.

stepfather. Jeanne Glavin and Robert Bennett were both heroin addicts, and they lived in the manner of heroin addicts, all while trying to take care of a young child. Glavin and Bennett lived a peripatetic existence, staying with one set of friends or relatives for a time and then moving on. Eventually in about 1983, Jeanne secured an apartment in East Boston. By this time she had a second son, Robert. It is unclear what Glavin, Bennett, and their sons lived on during this time, though it is probable that Jeanne collected public assistance. Though Bennett was able to do roofing work, he also worked as a male prostitute to support his addiction. Bennett and Glavin quarrelled periodically, and Glavin would throw Bennett out of the house. During these separations, he often stayed with Cathy St. Germain, a friend to both Glavin and Bennett, and she became very familiar with the family's problems as a result.

The consequences of this lifestyle were disastrous for David. The PSR describes David Glavin's upbringing as one "that lacked supervision, structure, and discipline." PSR ¶92. The situation was far worse than that. By the time David was 11 years old, his mother was turning him into a drug addict by injecting him with heroin. Robert Bennett was teaching David how to steal. Both adults taught David that drug use was acceptable, if not actually expected of him. It is certainly not surprising, therefore, that David got into trouble with the law as a

teenager. The PSR notes that he was arrested along with two other boys in 1987 for trying to steal a car in East Boston. PSR ¶74. There were no other arrests until nearly four years later, in the spring of 1991.

By the early 1990's the situation in David's home had gone from bad to worse. In 1988, Jeanne Glavin was found to be HIV+; she discovered her status after a bout with pneumonia. Though Bennett refused to be tested for the virus, the couple knew he was infected as well. Around this time the family left East Boston and moved to South Boston; they lived on Mercer Street next to the Old Colony projects. By 1991, when David was arrested for the second time, he was a fully formed heroin addict. His mother and Bennett would send him on errands to procure drugs for them and would give him drugs to use. A Department of Youth Services report dating from late 1992 states that both Jeanne Glavin and Robert Bennett were disabled from AIDS.[2] One reason Glavin was so involved in theft-related offenses between 1991 and 1994 is that his parents needed him to steal for them in order to sustain their heroin addictions, since

---

[2] The DYS report is a remarkable artifact. Jeanne Glavin told numerous lies to the DYS worker who visited the home; most significantly, she gave no hint of the family's drug addiction. Despite the many red flags raised by Glavin's disclosures during the interview, DYS made no apparent attempt to investigate the home further, and during most of David's DYS commitment he was allowed to live at home.

they were both too sick to "work."  David Glavin reports that he would bring stolen goods home to Robert Bennett, who would then sell them in order to get drug money for the family.  This Dickensian state of affairs continued until the deaths of both Robert Bennett and Jeanne Glavin from AIDS in 1994 and 1995.

David Glavin has spent significant parts of the period from 1996 to the present in jail either serving sentences or awaiting disposition.  Distilling the PSR indicates that David was in jail between January and June, 1996; from March 1997 to December 1997; April 1998 to September 1998; July 1999 to July 2000; November 2000 to August 2001; and from March 2002 to August 2003.  He has been in custody in this matter from December 2003 to the present.

### Results of Psychological Testing

Counsel had Mr. Glavin evaluated by Dr. Peter Cohen, a forensic psychiatrist, and Dr. David Gansler, a clinical neuropsychologist.  Dr. Cohen believes that Mr. Glavin has a personality disorder which originated from the extreme abuse and neglect he suffered from during childhood.  He also suffers from severe opioid dependence.  His history of abuse and neglect "seems to have precluded Mr. Glavin from following a more normal course of personality development and left him particularly vulnerable to addiction and the criminality that is frequently associated with sustaining such a life-style."[3]  Mr. Glavin's

---

[3] Report of Dr. Peter Cohen, filed under separate cover.

5

history indicates that his criminal conduct has been almost solely motivated by the need for money in order to buy heroin for himself and his parents.

Similar, Dr. Gansler observes in Mr. Glavin a severe personality disorder which evolved directly out of extreme parental abuse and neglect. The abuse "included his mother's encouragement to use opioids as a coping mechanism. Clearly, this was a major barrier to the development of typical psychological coping mechanisms and the basis of his personality disorder and poly-substance abuse."[4] Both Drs. Cohen and Gansler believe that secure drug treatment is of the first order of importance in addressing Mr. Glavin's needs:

> In order to adequately meet his clinical needs, Mr. Glavin requires a secure six-month program to benefit from treatment. Such a program will provide the long-term structure needed to address such a serious dual diagnosis picture. This will provide him with the length of time needed to absorb information and develop coping mechanisms given the virtual absence of these factors presently. A multi-disciplinary approach will be required which include medication treatment to meet the goals of mood stability and reduced impulsivity. Individual and group therapy will also afford multiple opportunities for benefit.

Report of Dr. Gansler.

### Recommendations to the Court

This robbery was motivated by a need for money to purchase drugs. Though robbery is a crime of violence, counsel notes that

---

[4] Report of Dr. David Gansler, filed under separate cover.

this particular robbery was accomplished without actual violence and threatening behavior.  Counsel does not gainsay either the seriousness of this offense or the necessity for punishment.  Nonetheless, counsel submits that a sentence of sixty months is appropriate under all the facts and circumstances.  Counsel urges this Court to recommend that the Bureau of Prisons place Mr. Glavin in a residential substance abuse treatment program, pursuant to 18 U.S.C. §3621(e), during his confinement.

Mr. Glavin expects that he will be ordered to make restitution.  He asks this Court to order that his restitution payments commence after the date of his release from prison, pursuant to 18 U.S.C. §3572(d)(1) and (2).  He also asks the Court to waive the payment of interest on the principal amount owed on the ground of his poverty.  <u>See</u> 19 U.S.C. §3612(f)(3)(A).  The PSR at ¶¶137-140 indicates that he has no assets and it is unlikely that he will find employment on his release that will give him significant disposable income from which to pay interest.

WHEREFORE, for the above-stated reasons, the defendant David Glavin respectfully requests that this Court impose a sentence of sixty months in this case, along with the other recommendations outlined above.

DAVID GLAVIN

By his attorney,

_____
/s/ Syrie D. Fried
Syrie D. Fried
  B.B.O. # 555815
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061